IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS AUGUST 5, 2008

IN RE: A.R.
(DOB 8/13/05)
A Child Under Eighteen Years of Age

Direct Appeal from the Juvenile Court for Madison County
No. 45-40, 255      Christy R. Little, Judge

No. W2008-00558-COA-R3-PT - Filed October 13, 2008

Mother appeals the juvenile court's decision to terminate her parental rights. The minor child has been in the custody of the Department of Children's Services since he was five months old, as the juvenile court found that he was dependent and neglected. Following approximately sixteen months of services and a failed trial home visit, DCS filed a petition to terminate Mother's parental rights. The trial court terminated Mother's parental rights on the ground of "persistence of conditions." We affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Jeremy B. Epperson, Pinson, TN, for Appellant

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Joshua Davis Baker, Assistant Attorney General, Nashville, TN, for Appellee

Lanis L. Karnes, Jackson, TN, for Guardian Ad Litem

OPINION

## I. FACTS & PROCEDURAL HISTORY

L.R. ("Mother") gave birth to a son ("A.R.") on August 13, 2005, when Mother was fifteen years old. A.R.'s father was never involved in his life. Mother and A.R. lived with Mother's mother and stepfather.

On January 18, 2006, when A.R. was five months old and Mother was sixteen years old, the Department of Children's Services ("DCS") received a referral regarding possible harm to A.R. It was reported that Mother had thrown or dropped A.R. into a bean bag chair and stated on various occasions that she wanted to harm the child. Specifically, Mother reportedly stated that she wanted to throw the baby out the window, leave him outside in the cold to freeze to death, throw the baby in a trash can, or put him in the oven.

On January 25, 2006, DCS filed a petition to adjudicate A.R. dependent and neglected, alleging that A.R. was at risk of suffering injury, abuse or neglect pursuant to Tennessee Code Annotated section 37-1-102(b)(12)(F), (G). The petition recounted the allegations of the DCS referral and the results of its investigation to date. According to the petition, Mother would get angry when the baby cried at night, and Mother's family members stated Mother was "very rough with the baby and has thrown him on the bed." DCS also alleged that Mother "is said to leave the baby with people she hardly knows" and that Mother was dating a thirty-six year old man. Mother had reportedly been observed trying to care for the baby while intoxicated. According to the petition, Mother stated that she had been "diagnosed as bi-polar," and she admitted she sometimes had trouble controlling her anger. Mother stated she had recently started taking medication to help control her condition. According to the petition, Mother admitted to a DCS investigator that she had made statements about wanting to "get rid of the baby or throw him away or put him up for adoption," but she said she would not really harm A.R. and just says those things when she gets frustrated. Mother's mother also told the investigator that she had heard Mother's comments but did not take them seriously. Mother denied ever throwing A.R.

DCS sought an order finding A.R. to be dependent and neglected but maintained that there was a less drastic alternative to removing A.R. from Mother's home. DCS took the position that A.R. should be permitted to remain in the home of Mother and her mother, but subject to conditions and limitations outlined in a safety plan directed by the court for the protection of A.R. Specifically, DCS contended that Mother should not be left unsupervised with A.R., and it proposed that Mother be required to participate in in-home counseling. DCS also suggested that "a Healthy Start Nurse and Wet Nurse" be in the home weekly. Alternatively, DCS sought temporary custody of A.R.

On January 28, 2006, before a hearing could be held on DCS's petition, A.R. was taken to the emergency room with a head injury. According to Mother, A.R. had a CT scan and MRI, and he was kept in the hospital for two to three days "for observation." The trial court held a preliminary hearing on January 31. Mother was present, along with her appointed counsel, the guardian ad litem for A.R., and various personnel from DCS and Child Protective Services ("CPS"). The trial court found probable cause to believe that A.R. should be removed from Mother's home, and that despite

the reasonable efforts of DCS, there was no less drastic alternative to removal. The court also found that the emergency nature of the child's condition justified the lack of further preventive measures. The court found it was contrary to A.R.'s best interest to remain in Mother's custody, explaining,

> [Mother] has reportedly dropped the child and thrown him into a beanbag. She has further made statements indicating a desire to harm the child . . . . A safety plan was attempted to avoid removal but over the weekend of January 28, 2006, the baby was injured while in [illegible] and medical attention had to be sought for the infant. The baby's head was either banged against the wall by [Mother] or she was carrying him and his head hit a doorway when she walked through it. She admitted that this occurred while she was having an argument with her mother . . . .

The court granted custody of A.R. to DCS pending an adjudicatory hearing. Mother was adjudicated delinquent as a result of the altercation with her mother, and Mother entered DCS's Juvenile Justice program. On February 1, 2006, Mother was admitted to Timber Springs Adolescent Center at Western Mental Health Institute ("Timber Springs") for a juvenile court ordered evaluation pursuant to Tennessee Code Annotated section 37-1-128(e)(1).[1]

On February 16, 2006, a permanency plan[2] staffing was held, which involved Ms. Tanzania Reid, DCS Case Manager for A.R.'s case, along with various other DCS personnel. The permanency plan listed as the "reasons for custody" that "there were allegations that [A.R.]'s mother banged him

---

[1] Tennessee Code Annotated section 37-1-128(e)(1) provides:

(e)(1) If, during the pendency of any proceeding under this chapter, there is reason to believe that the child may be suffering from mental illness, the court may order the child to be evaluated on an outpatient basis by a community mental health center, mental health institute or licensed private practitioner. If, during the pendency of any proceeding under this chapter, there is reason to believe that the child may be suffering from developmental disability, the court may order the child to be evaluated on an outpatient basis by the community mental health center, developmental center or licensed private practitioner designated by the commissioner of mental health and developmental disabilities to serve the court. If the professional attempting to perform the evaluation for mental illness or developmental disabilities determines that the evaluation cannot be performed properly on an outpatient basis, the court may order the child placed in a hospital or treatment resource, as defined in § 33-1-101, for the purposes of evaluation and for treatment necessary to the evaluation, for not more than thirty (30) days. If the court determines that there is reason to believe that the child:
(A) Is mentally ill; and
(B) Poses an immediate substantial likelihood of serious harm, as defined in Title 33, Chapter 6, Part 5, because of the mental illness;
the court may order the child placed in a hospital or treatment resource, as defined in § 33-1-101, for the purposes of evaluation and for treatment necessary to the evaluation, for not more than thirty (30) days. If a child is placed in a state-supported facility, the child shall be in the custody of the commissioner.

[2] A "permanency plan" is a written plan for a child placed in foster care with DCS or in the care of an agency. Tenn. Code Ann. § 37-2-402(8). Requirements for permanency plans are listed in Tennessee Code Annotated section 37-2-403.

against a wall." The permanency plan listed as its permanency goal: "reunify with parent" or "exit custody to live with relative." It established a goal target date of one year later, February 16, 2007.[3] Regarding Mother, the "desired outcome" of the plan was that Mother would "be able to cope with everyday stressors as a teenage parent" and "be able to demonstrate appropriate/positive parenting skills and have a positive relationship with [A.R.]." In order to achieve that outcome, Mother was required to (1) have a mental health assessment during her stay at Timber Springs and follow the recommendations of the assessment; (2) attend parenting classes through a contract agency; and (3) attend supervised visits with A.R., which would be arranged by DCS through a provider agency. Regarding the alternative outcome for A.R. – "exit custody to live with relative" – the plan required DCS to perform a diligent search to locate a relative, and conduct home studies and background checks of any relatives willing to take A.R.

On February 22, 2006, a psychological report was issued by Rebecca Stanfield, a Licensed Senior Psychological Examiner at Timber Springs, and the report was also signed by a social worker and a child and adolescent psychiatrist. The report detailed Mother's troubled history and past criminal charges. In the summer of 2003, she ran away from home. In October of 2003, Mother was charged with aggravated assault for pushing her mother. She was admitted to Timber Springs for an evaluation, then placed on "intensive probation" after returning home. At some point, Mother moved in with her boyfriend and became pregnant. In January of 2005, Mother was charged with theft after stealing jewelry. She was placed into DCS custody and a foster home. Mother had been removed from her mother's home on four occasions. Based on the most recent altercation between Mother and her mother, which led to A.R.'s head injury, Mother was reportedly charged with domestic vandalism and aggravated domestic assault. At Timber Springs, Mother told a nurse that she and her mother were "verbally fighting," and she denied hitting her mother. However, she admitted throwing a piece of glass and breaking a mirror. Regarding A.R.'s injury, Mother insisted that A.R. bumped his head earlier in the day, and when the police saw his bruise, they reported it.

The Timber Springs report indicated that Mother's family history was "positive for dysfunction," and that Mother said she was molested by her father when she was six years old. Mother stated that her father was incarcerated based on molestation charges, but he currently lived in Jackson and was "supportive" of her. Mother was currently in the tenth grade and doing well in school. She admitted past use of marijuana and alcohol but denied using them in the past year. At Timber Springs, Mother described a previous incident, two years before, in which she put a gun to her head and threatened to kill herself. She said she had been depressed because of problems with a boyfriend. After that incident, Mother was taken to a hospital for evaluation, and she received outpatient counseling. Mother described having anger control problems. Mother had previously been diagnosed with bi-polar disorder, and she had received outpatient services at Pathways and at the Professional Health Services in Jackson, along with school counseling. Mother's mother visited her at Timber Springs and said that Mother's family was also participating in counseling.

---

[3] The permanency plan is actually dated February 16, *2005*, and lists a target date of February 16, *2006*. These dates are clearly erroneous, as noted in the briefs, as A.R. was not even born until August of 2005.

The Timber Springs report stated that Mother had displayed good behavior "[w]ithin the structured and supervised setting of the psychiatric hospital[.]" Mother's evaluation results indicated "average intellectual abilities" and "average to above average" academic skills. Based on her testing and observations, however, the examiner concluded that Mother's "behavior will be typified by social undependability and a tendency toward exploitation of others." She noted that Mother "often acts as if she were indifferent to the welfare of others," and "[a]lthough she is willing to expend effort to achieve something for herself, she is difficult and resistant about carrying out what others ask of her." The examiner also noted Mother's "impulsiveness, short-sighted hedonism and her minimal regard for the consequences of her behavior" and predicted that "[d]ifficulties with both family and legal authorities may ensue." She described Mother's judgment as "typically undependable and highly erratic," and stated that "[h]er surface affability is often punctuated with abrupt and angry outbursts."

Beneath the heading "Diagnostic Impression," the examiner listed: Conduct disorder, adolescent onset type; Parent-child relational problem; and Posttraumatic stress disorder. The examiner then listed the "Treatment Team Recommendations" as follows:

> The results of the evaluation indicate that [Mother] should be returned to court for adjudication of her charges. . . . [Mother] has had a wide range of previous interventions including juvenile court-ordered evaluation, placement at Martin PTC, foster care, outpatient counseling and medication management. These interventions have not been successful in changing her behavior. However, she has done well in a structured and supervised setting, indicating that she is able to control her behavior and benefit from changes in her environment. Her mother has repeatedly told the treatment team that the entire family is in counseling and that she is willing to do whatever is necessary for [Mother] and her baby to be back at home. The treatment team has recommended that the court consider a continuation of community-based services to include a strict monitoring of [Mother]'s behavior in the community and at home. Both [Mother] and her mother could benefit from being involved in parenting classes. To improve the communication between [Mother] and her mother, in-home family counseling is recommended. [Mother] could also benefit from anger management counseling and she will need to continue her medication management appointments.
>
> Although [Mother] has an Axis I diagnosis, she is not committable under Title 33, Chapter 6, Part 5 Tennessee Code Annotated.

Mother's "discharge plan" stated that she would be discharged to the Madison County Juvenile Court.

On March 7, 2006, the juvenile court held an adjudicatory and dispositional hearing on DCS's petition to adjudicate A.R. dependent and neglected. Mother was present, along with her attorney, the guardian ad litem, and various DCS and CPS personnel. We do not have a transcript of the hearing, but the juvenile court's order states that the parties stipulated that A.R. was dependent

and neglected, and they further stipulated that the court could adopt the facts in DCS's petition from January 25 as its findings of fact. The court then listed the following specific findings of fact: Mother had made statements indicating a desire to harm the child by throwing him out the window or in a trash can, leaving him outside to freeze, or putting him in an oven;[4] and A.R. was subsequently taken to the emergency room with a head injury that occurred while Mother was in an argument. The court found clear and convincing evidence that A.R. was dependent and neglected, and that there was no less drastic alternative to removing A.R. from Mother's custody, despite DCS's reasonable efforts to prevent removal by attempting a safety plan that would allow supervised visitation in Mother's mother's home. Again, the court noted that the lack of further preventive measures was reasonable, considering the emergency nature of A.R.'s circumstances. The juvenile court approved the permanency plan prepared by DCS and made it an order of the court, upon finding that the plan was reasonable, with appropriate goals and responsibilities for the parties. A.R. was to remain in the custody of DCS, and supervised visitation would take place through the Carl Perkins Center for the Prevention of Child Abuse.

On April 5, 2006, a revised permanency plan was created by the following participants: Mother; Mother's attorney; A.R.'s case manager, Ms. Reid; Court Appointed Special Advocate ("CASA"), Shannon Stewart; guardian ad litem, Lanis Karnes; A.R.'s foster mother; and various other DCS personnel. This plan did not change the permanency goal of "reunify with parent or exit custody to live with relative," but it extended the goal target date from February 16, 2007, to April 5, 2007. The desired outcome remained that Mother would be able to cope with everyday stressors and be able to demonstrate appropriate and positive parenting skills in a positive relationship with A.R., and the plan also listed a desired outcome that Mother would be able to display appropriate independent living skills. In order to accomplish this, Mother was required to follow the Timber Springs examiner's recommendations that she continue her parenting classes, attend counseling sessions through Professional Health Services, and continue medication management with her mental health provider. Mother was also required to complete an independent living assessment and continue supervised visitation with A.R.

The revised permanency plan was approved by the juvenile court following a hearing on April 25, 2006. The court again found that DCS was making reasonable efforts toward reunification by providing counseling, parenting classes, medication management, an independent living assessment, and medical and dental care, as well as diligently searching for a relative and A.R.'s father. The court also noted in its order that Mother was doing well in school and on honor roll, and the order stated that "once the plan is complete, there should be no barriers for [A.R.]'s return to her care." The order provided that A.R. should be allowed to have unsupervised weekend visits with Mother until her summer vacation from school, at which time, if the weekend visits were going well, Mother would be allowed additional unsupervised visitation.

---

[4] Despite the stipulation at this hearing, Mother later testified at the termination hearing that she did not make any of these statements.

After this order was entered, a Child Abuse Review Team that had reviewed A.R.'s case recommended that Mother not be allowed increased visitation with A.R. The juvenile court held another hearing on May 30, 2006. The court's order notes the Child Abuse Review Team's concerns and also states that Mother's foster home had expressed concerns about Mother's behavior. According to the foster mother, during a visit with A.R. at the foster home, Mother was observed holding the baby in the swimming pool with one hand and holding a cigarette in her other hand. On another occasion, Mother left A.R. and the foster mother's four year old child in the house alone. The foster mother also reported that Mother refused to follow the schedule she had established for A.R. The court's order states that A.R.'s foster mother was willing to take Mother into her home and to supervise Mother with A.R., and the court approved that arrangement. Again, the court found no less drastic alternative to removing A.R. from Mother's custody, despite the reasonable efforts of DCS as set out in the permanency plan.

A.R. turned one year old on August 13, 2006. On October 26, 2006, a third permanency plan was drafted, which provided for continued supervised visitation, parenting classes, counseling sessions, and medication management. This third plan did not alter the goal target date of April 5, 2007. Mother signed the permanency plan, and she also signed a document acknowledging that she had received an explanation and copy of the criteria and procedures for terminating parental rights. The permanency plan was approved by the juvenile court following a hearing on December 5, 2006. The court found that DCS was making reasonable efforts at reunification, yet the need for foster care still existed. The court ordered that Mother be allowed two weeks visitation with A.R. at Christmas, and "if the home check[ed] out," A.R. would begin a 90-day "trial home visit" with Mother at her mother's home.[5] The order states, "Once [Mother] completes her plan as a delinquent child and completes the plan for [A.R.], there should be no barriers to the stated goals."

On February 20, 2007, Ms. Reid, DCS Case Manager, filed a motion for review in which she stated that A.R. was "doing well" in the home of Mother and her mother. She stated, "If there are no problems during the trial home visit, [A.R.] will leave custody and custody will be returned to his mother[.]" On February 24, 2007, DCS received a report of possible harm concerning A.R., concerning a bank employee who reported to police that she witnessed Mother hitting A.R. repeatedly at the bank. The juvenile court held a hearing on February 27, and its order notes that a CPS investigation was pending in Gibson County based on the bank employee's report. Nevertheless, the court allowed A.R.'s trial home visit with Mother to continue pending a further hearing scheduled for April 3, although A.R. would legally remain in DCS custody. Again, the court found that DCS was making reasonable efforts to reunify A.R. and Mother.

Around March of 2007, the guardian ad litem filed a motion seeking a restraining order against Mother's fiancé, prohibiting him from assaulting, molesting, calling, or harassing A.R. at daycare or at home. The guardian ad litem alleged that Mother's fiancé had previously been charged

---

[5] Mother had completed the program required by Juvenile Justice, and that program recommended that Mother return for a 30-day trial home visit with her mother. Mother was then removed from DCS custody, but she remained on probation.

with contributing to the delinqency of a minor, he had several assault charges, and he had violated his probation. It appears that the trial court did enter a restraining order prohibiting unsupervised contact between the fiancé and A.R., though the order is not in the record.

On the morning of April 3, 2007, prior to the scheduled hearing that afternoon, A.R.'s daycare contacted DCS and reported that A.R. had severe bruises on his legs. At the afternoon hearing, the juvenile court judge saw the bruises and immediately terminated A.R.'s trial home visit with Mother, stating, "there has been a new referral received regarding the minor child and some unexplained bruises on the child's legs and back of various ages and colors." The court ordered that Mother would again be limited to supervised visitation, and A.R. was placed in a new foster home. Again, the court found DCS had made reasonable efforts to prevent removal of A.R. by providing the services listed in the parenting plan and proposing the trial home visit.

On June 5, 2007, DCS filed a petition to terminate the parental rights of Mother based on the ground of persistent conditions, Tennessee Code Annotated section 36-1-113(g)(3), and on the ground of substantial noncompliance with the permanency plan, Tennessee Code Annotated section 36-1-113(g)(2). The petition also sought to terminate A.R.'s father's parental rights on the ground of abandonment. Mother filed a motion seeking another 90-day trial home visit with A.R. Mother also moved for an evaluation of her parenting skills, to be funded by the Administrative Director of the Supreme Court, because Mother claimed she was indigent. Following a hearing on August 14, 2007, the court entered an order denying Mother's request for additional visitation. The court noted its concerns about Mother's fiancé and the fact that Mother had quit high school, concluding that Mother's "ability to stabilize remains an issue without improvement and unresolved as of this date." The court granted Mother's motion for an evaluation of her parenting skills, with the stated goal of determining whether A.R. could be safe in Mother's care in the foreseeable future, or conversely, whether Mother had such deficiencies in her skills as to make it unlikely that A.R. could be safe in her care.

Mother subsequently turned eighteen years old. On December 4, 2007, the court held a hearing to review A.R.'s case and a revised permanency plan drafted November 5. That permanency plan is not in the record. The court approved the plan's modified permanency goal of "exit custody to live with relatives/adoption," over Mother's objection. The court found that this goal was appropriate and in A.R.'s best interest because A.R. had been in DCS custody for over fifteen months, and "imminent return to Mother [was] not foresesable."

The final hearing on DCS's petition to terminate parental rights was held on January 22, 2008. A.R.'s father did not appear at the hearing. His attorney was present, but A.R.'s father did not contest the termination of his parental rights. A.R.'s father had previously informed the guardian ad litem that he knew Mother well, and he thought it was in A.R.'s best interest to remain with his current foster parents. The court orders and filings that preceded the termination petition were introduced into evidence as exhibits.

Ms. Reid, A.R.'s DCS Case Manager, testified that she had been involved in his case as Case Manager since he first came into DCS custody in January of 2006. Ms. Stewart testified she had also been working with A.R., through CASA, since January of 2006. Both testified about the various permanency plans for A.R. and how DCS attempted to help Mother comply with the plans. Ms. Reid testified that she explained to Mother the consequences of failing to comply with the plans and the possibility that her parental rights would be terminated if she failed to comply. Ms. Reid also testified that DCS paid for Mother's supervised visitation with A.R. through the Carl Perkins Center for the Prevention of Child Abuse. Mother was currently having one to two hours per week of supervised visitation, and the reports from her visitation were good. An employee of the Carl Perkins Center testified that based on her observations during the supervised visitation, she thought Mother was ready for some unsupervised visits with A.R However, she acknowledged that she had not observed Mother with A.R. outside of the supervised setting at the Carl Perkins Center, and she had not witnessed any instances in which A.R. needed discipline, in order to observe Mother's reaction. When shown pictures of the bruises on A.R.'s legs, which were reported by his daycare, the visitation supervisor stated she "would certainly not be comfortable about those bruises" and would report them to DCS because they did not appear to be normal bruises.

DCS also paid for Mother's parenting classes provided through the Carl Perkins Center. Regarding the parenting classes, Mother testified, "they came to the house sometimes, and then other times they transport[ed] me there." Mother completed the parenting classes prior to her trial home visit with A.R. Ms. Reid testified she did not think Mother sufficiently progressed in the parenting classes because of the "repetition of bruises" that A.R. sustained during Mother's parenting time, even after she completed the classes.

Ms. Reid testified about Mother's counseling, funded by TennCare, which she described as "very critical" to Mother's success. Ms. Reid testified that Mother's mother and a DCS case worker were responsible for providing Mother's transportation, but Mother usually rode with her mother because she was also in counseling. In accordance with the recommendations of the Timber Springs examiner, the second permanency plan, dated April 5, 2006, required Mother to attend counseling at Professional Health Services. Ms. Reid testified that DCS referred Mother to Professional Health Services for individual and family counseling to address the issues involving A.R. and Mother's anger issues involving her mother. Mother testified that she was scheduled to attend counseling every two weeks. However, Professional Health Services discharged Mother because she continued to miss her appointments. Ms. Reid was informed by Professional Health Services that clients are usually discharged after missing three scheduled appointments, but Mother missed ten appointments before they finally discharged her. Ms. Reid testified that the staff at Professional Health Services "went above and beyond what they usually do" to assist Mother. Ms. Reid then recommended that Mother receive counseling at Quinco Mental Health Center, and she began case management and counseling sessions, which were scheduled every two weeks. However, Mother quit going to counseling at Quinco after she and her mother moved to Milan, Tennessee. Mother testified that they moved to Milan in May of 2007, and she quit her counseling at Quinco in July of 2007. The petition to terminate Mother's parental rights was filed on June 5, 2007. DCS learned that Mother

quit her counseling in October of 2007. Ms. Reid then recommended two counselors in Milan, and Mother began counseling at Pathways in November of 2007.

Mother testified that her reasons for moving to Milan were, "50/50," to be closer to her fiancé, who lived in Milan, and because Mother's mother wanted to get away from Mother's step-father's family when they divorced. Mother testified that she knew her counseling was "vital" to changing her behavior, but she acknowledged that she did not tell her case manager that she was not going to her counseling appointments. Mother testified that she quit her counseling at Quinco after she moved to Milan because it was "a hassle" going from Milan to Jackson with her work schedule. When asked why she did not tell anyone at DCS that she needed transportation, she replied, "Well, I was working all the time." Mother testified she was working full-time at a Taco Bell, but only six hours per day. Mother explained that she had "carpel tunnel syndrome in [her] feet and heel spurs," which limited her ability to work, so she was hoping to qualify for disability benefits. However, Mother later testified she intended to enroll in a nursing program in Jackson after she completed her GED classes. When asked how she could financially provide for A.R., Mother told Ms. Stewart that "if she regained custody of [A.R.], she would be able to get on food stamps . . . [and] help like that."

Ms. Reid testified about the report of abuse from the bank employee in February of 2007, during the trial home visit. According to Ms. Reid, the bank employee reported that she had observed Mother hitting A.R. "so bad" that the employee followed Mother out to the car and wrote down the license plate number. The bank employee reported the incident to police, and apparently the police department relayed the information to DCS. According to Ms. Reid, the police department concluded that it could not press charges against Mother because there were no bruises following the incident. The CPS investigation was also classified as "unfounded" because there were no bruises. Mother testified about the incident, explaining that she was in the bank speaking with a loan officer, and

> [A.R.] was being a typical one-year-old and running around. He had already gashed his head up with one incident when I had had him at the house and he stood up in the bathtub and he couldn't – I couldn't get a grip of him and he fell and sliced his head open on the little bathtub thing.
>     And I was very, very cautious of him then. And I did not want him running around and falling. And my child trial home visits gets disrupted. So I smacked him on his leg and I told him no. And I took him out to the car . . . .
>     . . . I said, we have to leave because he was screaming. I didn't want to be embarrassed so I just decided to take him home.
> . . .
> But I wasn't hitting him. I was passing a bottle to him to make him, you know, try to stop screaming.

Mother said the bank employee must have been mistaken about her hitting A.R. because she was simply giving him a bottle.

Ms. Reid also testified about the bruises reported by the daycare in April of 2007, which she described as "very severe." When the daycare called about the bruises, Ms. Reid sent Ms. Stewart, from CASA, out to the daycare to investigate the situation and take pictures of the bruises. Ms. Stewart explained that the bruises "looked like someone had taken his little leg and just squeezed it really hard and caused it to bruise." Ms. Reid said she had never seen bruises like that before, and that they looked like fingermarks, "[o]n both legs . . . [u]p and down his whole leg . . . just all over." Ms. Reid said these bruises were not normal bruises, as they were different in severity. As previously discussed, the juvenile court terminated the trial home visit the same day, and A.R. was placed in a new foster home. Ms. Reid testified that she took A.R. to the doctor the next day. The doctor stated that the bruises did appear to be fingerprints, as they were in patterns. A.R. tested negative for blood disorders, which ruled out the possibility of "organic causes" of the bruising. Ms. Reid testified that when she asked Mother about the bruises, Mother told her she had not seen the bruises, but they could have been from carpet burn or the trampoline. At trial, Mother was questioned about the bruises as follows:

Q. Did you see the bruises on his legs?
A. I had seen them at one time like, the day that we took him to the daycare because I get him up and get him dressed, give him a bath and get him ready for school. And they weren't as bad as what they seemed like in the picture as what I had seen.
Q. When did you first see them?
A. I seen them that night that I had put him to sleep. And then I woke up the next morning and they weren't that bad.
. . .
    I didn't really pay much attention to them because he kicks the crib a lot . . . . And sometimes he would try to get out of the crib and kicks his crib a lot. That's where I thought the bruises had come from, but I had never mentioned it.
. . .
Q. You're older now. Okay. Let's just pretend that you were really naive back then and thought that a child would do that to himself. Do you still think that?
A. Well, no. But he, you know, babies, they do get bruises. The toddlers will all get bruises and sometimes you don't know where they come from.
Q. Have you ever seen another child look like that?
A. I have.
Q. Really?
A. I have.
Q. How many times?
A. I've seen about three or four running around here that people need to start paying attention to more than me. But, you know, I don't go off reporting it just because it looks like child abuse.

Mother went on to accuse the daycare workers of causing A.R.'s bruises.

Various witnesses also testified about the problems encountered in Mother's foster homes. Ms. Stewart testified about Mother being removed from one foster home because the foster mother was "frustrated with the way that [Mother] was parenting [A.R.]." This was the foster home where Mother was holding A.R. in the pool while holding a cigarette, and where she left A.R. in the home with the four year old, unattended. The foster mother also reported that Mother would not follow the schedule she put in place for A.R. Mother acknowledged that she had "some disputes" at the foster home, and she accused the foster mother of making obscene comments about her. Ms. Reid and the guardian ad litem then worked to arrange for Mother to be in the same foster home with A.R. beginning in May of 2006. Ms. Reid said she thought placing them together would assist Mother in reaching her goals under the permanency plan because the foster mother would be a good mentor, who could teach Mother how to properly care for A.R. Ms. Stewart similarly testified that this was "a very good foster parent who was willing to work with [Mother] in teaching her how to parent." However, Ms. Stewart explained that Mother continued to go out and "live the life of a teenager," and "the foster parent was doing more of the care for [A.R.] than [Mother] was." Ms. Reid similarly testified that Mother went to "teenage parties" on the weekend. Mother testified that it was this foster mother who "taught" her that hitting your child is appropriate discipline, stating, "that's where I learned it from."

Mother also became engaged while living at the foster home with A.R., and Ms. Reid and Ms. Stewart testified they were concerned about the man being around A.R. because he was older than Mother, and he had "a record" and "a troubled past." Mother's fiancé had been charged with sexual exploitation of a minor. Ms. Stewart, Ms. Karnes (the guardian ad litem), and Mother's probation officer all attempted to warn Mother about her fiancé, but Mother disregarded their advice. The juvenile court entered some type of restraining order limiting the fiancé's contact with A.R. At trial, Mother testified that she and her fiancé were no longer together, and she explained that approximately two months before, her fiancé was taken to jail after they got into an argument and "he threw punches." Their altercation led to a domestic assault charge and an order of protection being entered against the fiancé.

Mother testified she was taking three medications because of her bi-polar disorder: Lexapro, Trileptal, and Seroquel. Mother testified she had been taking these medications for the past three to four years. She said she still has mood swings even when she takes the medications, but "not as bad as I do when I'm off my medication." Mother explained what happens when she quits taking the medications:

> My mood swing gets very, very bad. It may not be if I just miss one day because sometimes I do that when I have to go to work early in the morning. But I always remember to take them the next day because I always know what happens.

Mother testified she was sexually molested by her father when she was six years old and living in Florida. She testified she was not counseled for the sexual abuse "back then," and she subsequently moved to Tennessee to live with her grandparents until her mother moved here as well.

Veldon Reedy, the licensed clinical social worker who interviewed Mother for the court-ordered parenting evaluation, testified as to his findings. His evaluation was based on two interviews with Mother in November of 2007 and reviewing Mother's records from CASA and Quinco, along with some other legal documents provided by Mother's attorney. Mr. Reedy noted Mother's "long history of emotional and environmental instability" and several of Mother's characteristics that could impede her ability to parent A.R. Mr. Reedy was particularly concerned by Mother's previous diagnosis of "bi-polar disorder with serious emotional disturbance." He said patients with bi-polar disorder need close psychiatric monitoring, as their medications can cause side effects or begin to lose effectiveness over time. Mr. Reedy opined that Mother would always need psychiatric care and medication. Mr. Reedy also mentioned that Quinco's notes reflected Mother's history of being sexually molested; however, he said he did not discuss the molestation with Mother because that was not the purpose of his interviews. Next, Mr. Reedy discussed Mother's past "self-injurious behavior" and threats of suicide. Quinco's notes revealed that Mother had cut herself on at least one occasion, and she had also placed a gun to her head and threatened to kill herself. Mr. Reedy discussed Mother's "history of poor choices regarding male friends," particularly with regard to her fiancé. Based on his interviews with Mother in November, Mr. Reedy was concerned that Mother's fiancé might continue to show up in her life, even if uninvited. Mr. Reedy also referenced Mother's past criminal behavior, past drug and alcohol use, her history of numerous foster care placements, and her decision to quit high school. Mr. Reedy said that Mother's above average intelligence was not exhibited in her insight and judgment.

Mr. Reedy testified that Quinco appeared to have provided counseling to Mother directed toward her bi-polar disorder and also toward case management services, which, based on the situation, typically include anything from money management skills, job interviewing skills, skills regarding cooking or maintaining good hygiene, or "just functions of daily living type of things." Mr. Reedy testified that Mother had a low Global Assessment of Functioning ("GAF") score, according to Quinco's notes, which meant that she had impediments to normal functioning. He also explained that the GAF score could be used to monitor progress, in that it should increase with treatment through medication and therapy. Despite Mother's medication and therapy, however, her score had not improved. Quinco's notes documented Mother's "back and forth" progress, he said, such as "little progress, little progress, some progress, no progress." Mr. Reedy also noted that Quinco's records reflected Mother had missed some of her counseling sessions.

Mr. Reedy mentioned that Mother, to his knowledge, had never received treatment for post traumatic stress disorder secondary to her sexual abuse at the age of six. Mr. Reedy stated that he did not recall seeing the diagnosis of post traumatic stress disorder in Quinco's notes, and that was why he concluded that Mother had not been treated for it, but he reiterated, "I don't know that she wasn't treated." He explained that "[v]ictims of sexual abuse who go untreated tend to have dysfunctional family and peer relationships for years following their abuse," and he noted Mother

had difficulties with her mother and others. He said, "all these interactions and life difficulties may not be related to her sexual abuse," but it could not be ruled out as a cause and should be addressed in long-term counseling.

The guardian ad litem asked Mr. Reedy about Mother's previous statements indicating an intent to harm A.R., and their relation to Mother's bi-polar disorder. Mr. Reedy expressed concern, stating that a person with bi-polar disorder could act upon such thoughts. He testified that Mother's abuse of A.R. seemed to be a product of her impulsivity and anger issues.

In conclusion, Mr. Reedy testified that Mother was not prepared to assume the responsibilities of parenting A.R. Mr. Reedy concluded that Mother would "continue to display patterns of impulsivity, hyper-emotionality and dysfunction in her relationships" until she received intensive psychotherapy treatment for both bi-polar disorder and post traumatic stress disorder. In addition, Mr. Reedy recommended that Mother continue to receive case management services to address the issues of money management, decision making, and social skills. He also advised that Mother be required to attend ongoing parenting classes, anger management classes, and "appropriate activities of daily living" classes. Finally, Mr. Reedy recommended that Mother continue her psychiatric treatment and medication, and be required to submit to periodic random drug screens. Mr. Reedy testified that Mother would need to follow all these recommendations consistently for a minimum of one year, and if Mother's treatment was not continuous, that would extend the period of treatment. Mother's counsel asked Mr. Reedy if it would then be possible for Mother to parent A.R., if she followed all of his recommendations, to which Mr. Reedy responded:

> I don't know. I would – I'm in the business of hope. As far as the therapy, . . . I would hope anybody could that stayed in treatment, managed the medication correctly. I cannot say that she will ever be able to parent.

The guardian ad litem stated that she did not believe A.R. could be safe in Mother's home because of the past abuse and Mother's issues with her bi-polar disorder. Ms. Reid stated her opinion that Mother's parental rights should be terminated, and she explained that she "would not consider [A.R.] safe in his mother's care because of the consistency with the bruises and the abuse." Ms. Stewart similarly testified that she did not think Mother had the ability to adequately parent A.R. Ms. Stewart pointed out that A.R. had been in DCS custody since he was five months old, and, as he was currently two and a half years old, he had been in the custody of his current foster parents longer than he had lived with Mother. A.R.'s current foster parents testified that they loved A.R. very much and wished to adopt him. They also testified that A.R. was doing well in their home, and that he calls them "mommy" and "daddy."

On February 5, 2008, the juvenile court entered its final order. The court found that DCS failed to prove, by clear and convincing evidence, the first ground for terminating Mother's parental rights: substantial noncompliance with the permanency plans. The court found that Mother did fail to complete the required counseling, but it noted the permanency plan's other requirements, such as parenting classes and medication management, which Mother completed. However, the court found

that DCS had proven the second ground for terminating Mother's parental rights: persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3). The court found that despite the reasonable efforts of DCS to assist Mother, the conditions that led to the removal of A.R. from Mother's home still existed, along with other conditions that in all probability would cause A.R. to be subject to further abuse and/or neglect. In addition, the court found little likelihood that these conditions would be remedied at an early date to allow the return of A.R., and that continuing the parent-child relationship would greatly diminish A.R.'s chances of early integration into a stable and permanent home. Regarding A.R.'s father, the court found clear and convincing evidence to terminate his parental rights on the ground of abandonment. The court also found that it was in A.R.'s best interest to terminate the parental rights of Mother and A.R.'s father.

Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents the following issues, as we perceive them, for review:

1. Whether the juvenile court erred in applying Tennessee Code Annotated section 36-1-113(g)(3), because A.R. was not "removed from the home of the parent or guardian by order of a court for a period of six (6) months," as required by the statute;

2. Whether the juvenile court erred in finding that DCS made reasonable efforts to reunite Mother and A.R., as required when terminating parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3);

3. Whether the juvenile court erred in concluding that it was in A.R.'s best interest to terminate Mother's parental rights.

DCS does not appeal the trial court's finding based on the ground of substantial noncompliance with the permanency plan, and A.R.'s father does not appeal the termination of his parental rights. Thus, the only issue before us is whether the juvenile court properly terminated Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(3).

## III. STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001)). Although this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *Id.* The parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. *In re Audrey S.*, 182 S.W.3d at 860. A court may not terminate a parent's rights to his or her children unless there is specific statutory authority to do so. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, they must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* Because no civil action carries graver consequences than a petition to sever family ties forever, a person seeking to terminate parental rights must prove both of the elements for termination by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of the heightened burden of proof in parental termination cases, on appeal, we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *Id.* Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *Id.* Whether a statutory ground for termination has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008); *State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *3 (Tenn. Ct. App. Aug. 31, 2007).

## IV. DISCUSSION

### A. Persistence of Conditions

In this appeal, we are dealing with the statutory ground for termination of parental rights commonly referred to as "persistence of conditions," defined in Tennessee Code Annotated section 36-1-113(g)(3) as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;
> . . . .

This ground for termination only applies "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." **In re Audrey S.**, 182 S.W.3d at 874.

On appeal, Mother argues that this ground for termination is inapplicable because A.R. was not "removed from the home of the parent or guardian by order of a court for a period of six (6) months," as required by the statute. As previously discussed, the juvenile court entered an order on April 4, 2006, following an adjudicatory and dispositional hearing, explicitly finding that A.R. was, in fact, dependent and neglected and ordering that A.R. remain in DCS custody. DCS filed its petition to terminate Mother's parental rights on June 5, 2007. Mother argues, though, that because of the intervening trial home visit, A.R. had only been "removed" from her home for two months at the time of the termination petition. She also argues that because this "most recent removal" was not based on another judicial finding of dependency, neglect, or abuse, it does not satisfy the elements of the statute. Mother does not cite any authority to support either of these arguments, and from our review of the record, it does not appear that Mother raised these arguments in the trial court. Nevertheless, we have considered Mother's arguments and find them without merit.

According to the statute, the ground of "persistence of conditions" is applicable when "[t]he child has been removed from the home of the parent or guardian by order of a court for *a period of six (6) months*." Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2007) (emphasis added). The statute does not require that the six-month period immediately precede the filing of the termination petition, as Mother assumes. The General Assembly explicitly placed such limitations on the relevant time periods for other termination grounds, but it did not do so here. *See, e.g.*, Tenn. Code Ann. § 36-1-102(1)(A)(i) (providing the relevant time period in the context of abandonment as the "four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent"). The ground at issue in this case only requires removal from the home

-17-

by order of a court for "a period of six (6) months." Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2007). Furthermore, the "trial home visit" did not return custody of A.R. to Mother. The juvenile court's order approving the trial home visit explicitly stated, "the child, [A.R.], shall remain in the custody of the State of Tennessee, Department of Children['s] Services pending further order from this Court." We reject Mother's argument that a second judicial finding of dependency, neglect, or abuse was required when A.R. was removed from her home, when Mother only had temporary, physical custody of A.R. in the first place.

### B. Reasonable Efforts

In cases involving the removal of a child from the parent's custody, the success of the parent's remedial efforts generally depends on DCS's assistance and support. *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004); *State Dep't of Children's Servs. v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *10 (Tenn. Ct. App. Aug. 13, 2003)). "Accordingly, in the absence of aggravating circumstances, the Department is statutorily required to make reasonable efforts to reunite a family after removing children from their parents' custody." *Id.* (citing Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005); *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *9 (Tenn. Ct. App. Aug. 16, 2004); *In re C.M.M.*, 2004 WL 438326, at * 7). Specifically, DCS is required by statute to make "reasonable efforts" to make it "possible for the child to return safely to the child's home." Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005). Because of this obligation, when DCS seeks to terminate parental rights on the ground of "persistence of conditions," it must establish by clear and convincing evidence that it made reasonable efforts to reunite the family and that these efforts were to no avail. *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7-8). DCS's efforts need not be "herculean," but it must do more than simply provide parents with a list of available services and send them on their way. *Id.* at 519 (citing *In re C.M.M.*, 2004 WL 438326, at *7). DCS's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* (citing *In re A.J.H.*, No. M2005-00174-COA-R3-PT, 2005 WL 3190324, at *9 (Tenn. Ct. App. Nov.28, 2005); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. June 30, 2005); *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb.14, 2002)). On the other hand, DCS "does not have the sole obligation to remedy the conditions that required the removal of the children from their parents' custody." *Id.* When reunification of the family is a goal, the parents share responsibility for addressing the conditions that led to removal. *Id.* Reunification is a "two-way street," and the law does not require DCS to carry the entire burden of this goal. *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). DCS cannot reasonably be expected to do everything for a parent. *In re T.M.D.Y.*, No. E2007-02357-COA-R3-PT, 2008 WL 933204, at *7 (Tenn. Ct. App. Apr. 7, 2008). If parents desire the return of their children, they must also make "reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519 (citing *State Dep't of Children's Servs. v. B.B.M.*, No. E2004-00491-COA-R3-PT, 2004 WL 2607769, at *7

(Tenn. Ct. App. Nov. 17, 2004); *In re C.M.M.*, 2004 WL 438326, at *7; *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov.18, 2002)).

"Reasonable efforts" by DCS means "the exercise of reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2005). In making such reasonable efforts, "the child's health and safety shall be the paramount concern." *Id.* What is "reasonable" depends on the circumstances of each case, but the factors that courts use to determine the reasonableness of DCS's efforts include:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519 (citing *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *9 (Tenn. Ct. App. Aug. 3, 2005); *State Dep't of Children's Servs. v. B.B.M.*, 2004 WL 2607769, at *6; *In re C.M.M.*, 2004 WL 438326, at *7).

The stated goal of the permanency plans in this case was reunification; thus, DCS was required to use reasonable efforts to make it possible for A.R. to return home to Mother. We must determine whether DCS presented "sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances." *In the Matter of J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 (Tenn. Ct. App. June 30, 2005) (citing *In re C.M.M.*, 2004 WL 438326, at *8). The juvenile court found that DCS used reasonable efforts to assist Mother with her problems through the Timber Springs evaluation and counseling, which the court described as "critical," along with the supervised visitation and arranging for Mother and A.R. to be placed in the same foster home for mentoring purposes. Despite these efforts, the court found that Mother "could not avail herself of the opportunities to make a significant change."

On appeal, Mother claims that DCS should have "addressed" the fact that Mother was a "teenage mother," and it should have considered that Mother was forced to rely upon her own mother to provide her with stable housing and transportation. We find that DCS did make reasonable efforts to help Mother with these issues. DCS paid for Mother to attend parenting classes through the Carl Perkins Center. Mother testified that "[t]hey came to the house sometimes, and then other times they transport[ed] me there." Regarding Mother's housing situation, DCS arranged for Mother to be placed in the same foster home with A.R., but rather than take advantage of the situation, it was reported that Mother went out and "lived the life of a teenager" and left the foster mother to care for A.R. DCS referred Mother to two different counselors, and even set up appointments for her, so that she could receive case management services addressing functions of daily living. However, Mother

consistently failed to attend counseling after she left foster care. Mother would simply quit going to counseling without even informing her Case Manager. She now claims that she did not have transportation to counseling because, although she had a driver's license, she did not have a car of her own and rode with her mother. Mother had previously been provided with transportation to her parenting classes, but she did not report to DCS that she had any problems arranging transportation to counseling. When asked why she did not tell her Case Manager that she needed transportation, Mother simply replied, "Well, I was working all the time." It appears that Mother had no problems finding transportation to work every day, but she could not manage to attend her counseling appointments every two weeks. Mother later admitted that she did not even keep track of her counseling appointments, and she relied on her mother to tell her when to go to counseling. In short, we find that DCS made reasonable efforts to assist Mother with the problems she encountered as a teenage mother living with her mother.

Next, Mother argues that DCS failed to make reasonable efforts to assist her because it did not provide her with the "most obvious and essential service" she needed: counseling for posttraumatic stress disorder. Mother argues that the counseling she was provided was "a waste of time and money" because it did not address the "root" of her problems stemming from her past sexual abuse.

In cases involving a parent with known mental health deficiencies, "we have repeatedly found that the Department's failure to provide needed psychological or psychiatric treatment constitutes a failure to exercise reasonable efforts." *In re R.L.F.*, No. M2008-00050-COA-R3-PT, 2008 WL 3069588, at *10 (Tenn. Ct. App. July 31, 2008) (citing *In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837 (Tenn. Ct. App. Dec. 13, 2007); *State of Tennessee, Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038 (Tenn. Ct. App. Jan 17, 2007); *State of Tennessee, Dep't of Children's Servs. v. Howard*, No. W2006-00585-COA-R3-PT, 2006 WL 2257341 (Tenn. Ct. App. Aug. 8, 2006); *State of Tennessee, Dep't of Children's Servs. v. S.V.*, No. E2006-00686-COA-R3-PT, 2006 WL 1864470 (Tenn. Ct. App. July 6, 2006); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862 (Tenn. Ct. App. June 30, 2005); *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179 (Tenn. Ct. App. Aug. 16, 2004)). However, we must determine what constitutes "reasonable" efforts based on the circumstances of the case before us. *In re Giorgianna H.*, 205 S.W.3d at 518.

We find it interesting that Mother now claims she should have been provided additional counseling, when Mother did not complete the counseling that was provided. Although the trial court found that Mother did substantially comply with the permanency plan as a whole, it specifically found she had not completed the required counseling. The final order states:

> [Mother] has not completed her counseling. DCS first obtained a psychological evaluation of [Mother] from Timber Springs. She was sent by DCS to Professional Health Services (PHS) but she quit. She missed more than 10 appointments and they closed her file. She did not tell DCS or ask for help. When DCS found out, they then paid for her to go to Quinco Mental Health Center and set

up her appointments. She received counseling and case management services. Case management included anger management, budgeting, parenting and independent living skills. She attended sporadically from 4/07 - 7/07 and quit because she moved to Milan, TN. She did not begin counseling again until 4 months later in 11/07.

Mother testified that it was "a hassle" for her to go to counseling at Quinco every other week. She then quit going to her appointments at Quinco, even though the petition to terminate her parental rights had been filed just one month earlier, and she knew counseling was "vital" to her success under the permanency plans.

In any event, from our review of the record, we have concluded that DCS's efforts to assist Mother were reasonable.[6] At trial, Mr. Reedy stated that he did not discuss the sexual abuse with Mother, and he did not know whether Mother had, in fact, been counseled regarding the sexual abuse. Mother testified that she was not counseled for the abuse when it occurred, nor did she receive any type of counseling prior to DCS's involvement. However, Mother testified that she discussed the sexual abuse with her counselors at Timber Springs, during both her admissions, and again at Professional Health Services and at Quinco. Mr. Reedy stated that he did not review the records from Timber Springs, and he did not mention reviewing any records from Professional Health Services. As the trial court noted in its final order, the treatment team at Timber Springs issued its evaluation with knowledge of Mother's past sexual abuse and her bi-polar condition. The Timber Springs evaluation provides, in relevant part:

> The treatment team has recommended that the court consider a continuation of community-based services to include a strict monitoring of [Mother]'s behavior in the community and at home. Both [Mother] and her mother could benefit from being involved in parenting classes. To improve the communication between [Mother] and her mother, in-home family counseling is recommended. [Mother] could also benefit from anger management counseling and she will need to continue her medication management appointments.

Timber Springs issued its treatment recommendations following Mother's three-week admission at Timber Springs, and the evaluation does not specifically recommend counseling for post traumatic stress disorder. Thus, we conclude that even if Mother did not receive such counseling, DCS acted

---

[6] The aforementioned cases in which DCS did not use reasonable efforts in providing psychological or psychiatric treatment are distinguishable. In those cases, this Court found a lack of reasonable efforts when DCS failed to provide needed counseling that had been recommended since its initial involvement in the case, *see In re M.E.*, 2004 WL 1838179, at *7-12, when DCS prematurely filed a termination petition, *see In re J.L.E.*, 2005 WL 1541862, at *10-15, when DCS did not provide parents' counselors with the parents' psychological reports and recommendations, *see In re A.R.*, 2007 WL 4357837, at *7, *State v. S.V.*, 2006 WL 1864470, at *4-7, and where the record did not evidence "any services" provided to aid a parent with a personality disorder, *see State v. Howard*, 2006 WL 2257341, at *6. Those circumstances are not present here.

reasonably in its efforts to assist Mother by providing each of the services recommended by Timber Springs.

In sum, we conclude that DCS's efforts were reasonable, and Mother's were not, under the circumstances. DCS provided numerous services to Mother in addition to those recommended by Timber Springs. Mother received parenting classes, counseling to address her bi-polar and anger issues, case management services, medication management, supervised visitation with A.R., the opportunity to live with A.R. in a foster home, and a trial home visit with A.R. DCS initially set a goal target date of one year from the permanency plan, but it extended the goal target date an additional two months. Still, Mother was not ready to provide a safe and stable environment for A.R. Two months after the goal target date had passed, DCS filed its petition to terminate Mother's parental rights. We agree with the trial court that these constituted "reasonable efforts" by DCS. DCS exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family," with A.R.'s health and safety being the paramount concern. *See* Tenn. Code Ann. § 37-1-166(g)(1) (2005) (defining reasonable efforts).

On appeal, Mother does not address the remaining elements of the "persistence of conditions" ground for terminating her parental rights. In addition to the six-month period of removal and reasonable efforts, DCS was also required to prove that:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). We have considered each of these elements and agree with the trial court that the facts clearly and convincingly establish each of them. The juvenile court found that the conditions leading to A.R.'s removal from Mother's home still existed, along with other conditions that would probably cause A.R. to be subject to further abuse and/or neglect. Specifically, the trial court found:

> [A.R.] was injured as a result of his mother's actions. It may be due to her impulsivitiy; her Bi-Polar condition; her lack of stability; her immaturity; her lack of an adequate support system; her inability to manage herself; her failure to improve (as seen in the GAF scores of 50); her lack of education; and/or her inability to profit from counseling; but [A.R.] was injured and continued to be injured in her care.

The court went on to list the various injuries suffered by A.R. and the other reports of harm. The court described the bruises reported by the daycare as "terrible bruises that the mother cannot or will not explain." When announcing her ruling from the bench, the trial judge stated that she was "quite certain" that if Mother was allowed another trial home visit with A.R., DCS would soon have to remove A.R. because of additional problems. Unfortunately, we agree with the trial judge. In cases involving the "persistence of conditions" ground,

> DCS is not required to prove that a parent-child relationship cannot be salvaged. Nor is DCS required to show that a parent is "currently harmful" to a child's safety or future emotional stability. The question herein is the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care with weekly visits with the mother. Our termination of parental rights statutes recognize a child's need for a permanent, stable environment which this mother has demonstrated she is unwilling or unable to provide.

*In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). "Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.*

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008). That concern is well demonstrated in this case. In sum, we find clear and convincing evidence that the conditions that led to A.R.'s removal, and other conditions that in all reasonable probability would cause him to be subjected to further abuse or neglect, still persist and prevent the child's safe return to Mother's care. There is little likelihood that these conditions will be remedied at an early date so that A.R. can be safely returned to Mother in the near future. A.R. has thrived in his foster home, and he has an opportunity to timely integrate into a stable, healthy environment. There is no guarantee that Mother will ever be able to provide a safe environment for A.R., and the time spent waiting for this to occur greatly diminishes A.R.'s chances of early integration into a safe, stable and permanent home. Thus, DCS properly established a ground for terminating Mother's parental rights.

### C. Best Interest

On appeal, Mother's final argument is that terminating her parental rights to A.R. is not in A.R.'s best interest because she "displayed appropriate behavior" at the supervised visits with A.R., and she has bonded with A.R.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated section 36-1-113(i) provides a list of some factors to consider in determining whether termination of parental rights is in the best interest of the child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

We must determine the child's best interest from the child's, rather than the parent's, perspective. *In re Marr*, 194 S.W.3d at 499.

No one disputed that Mother loved A.R. and had bonded with him. However, loving a child and being a good parent are not one and the same. In addition, "being an effective parent involves far more than visiting." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000) (quoting *State Dep't. of Children's Servs. v. Hunter*, No. M1999-02606-COA-R3-CV, 2000 WL 313549 at *1 (Tenn. Ct. App. Mar. 29, 2000)). Several other factors weigh in favor of terminating Mother's parental rights. Mother has not adjusted her circumstances

to make it safe, and in A.R.'s best interest, to be in Mother's care.  A.R. continued to suffer injuries while in Mother's care.  Despite the reasonable efforts of DCS, a lasting adjustment does not reasonably appear possible.  A.R. has already bonded with his foster parents, and terminating Mother's parental rights would not result in a change of caretakers and physical environment that would be detrimental to A.R.  Ms. Stewart testified about the significant improvements in A.R.'s behavior and development since he went to his current foster home in April of 2007.  She said A.R. had previously been referred for an evaluation at the Kiwanis Center due to concerns about A.R.'s physical development and speech.  Since he had been with the foster parents, however, he had greatly expanded his vocabulary and learned to sing his ABC's and other songs.  Various witnesses testified that A.R. was practically unmanageable when living with Mother.  For example, Ms. Stewart testified that when she visited A.R. and Mother once, A.R. tried to "destroy" Ms. Stewart's cell phone, but Mother did not attempt to discipline or even correct him.  Ms. Stewart testified that A.R.'s behavior had improved with his foster parents so that he is now under control.  A.R.'s father, A.R.'s Case Manager, CASA, and the guardian ad litem all recommended that A.R. remain with his foster parents and not be returned to Mother.  We similarly conclude that A.R.'s best interest would be served by terminating Mother's parental rights.

## V.  Conclusion

For the aforementioned reasons, we affirm the decision of the juvenile court.  Costs of this appeal are taxed to the appellant, L.R., and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.